1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES S. GARNETT,<br><br>            Petitioner<br><br>v.<br><br>RICHARD MORGAN,<br><br>            Respondent. | Case No. C05-1438MJP<br><br><br>ORDER GRANTING<br>PETITIONER'S HABEAS<br>PETITION |

This matter comes before the Court on Petitioner James Garnett's objections to Magistrate Judge Benton's Report and Recommendation rejecting Mr. Garnett's habeas petition. The Court, having reviewed the petition for a writ of habeas corpus (Dkt. No. 4), the Report and Recommendation of Monica J. Benton, United States Magistrate Judge (Dkt. No. 17), Petitioner's objections to the Report and Recommendations (Dkt. No. 20), the Government's response (Dkt. No. 22), Petitioner's reply (Dkt. No. 44), the parties' supplemental pleadings, and the balance of the record, does hereby ORDER:

      (1)     The Court ADOPTS IN PART AND DECLINES TO ADOPT IN PART the Report and Recommendation;

      (2)     James Garnett's petition for a writ of habeas corpus is GRANTED.  Mr. Garnett's conviction in Skagit County Superior Court Case No. 99-1-00636-3 is VACATED; and

      (3)     Execution of this Order shall be STAYED for thirty (30) days.  The STAY shall remain in effect until **February 25, 2008**.

ORDER — 1

1

## BACKGROUND

2       The Court's discussion of the facts is limited to those necessary to resolve Mr. Garnett's

3 objections to Magistrate Judge Benton's Report and Recommendation and to address the merits

4 of his habeas petition.

5       Petitioner James Garnett is currently incarcerated at the Washington State Penitentiary in

6 Walla Walla, Washington, where he is serving a life sentence without the possibility of parole.  He

7 was convicted in August 2007 on a charge of aggravated first degree murder.  He has filed a

8 petition for federal habeas relief under 28 U.S.C. § 2254, challenging the validity of his

9 conviction.

10      On direct appeal, the Washington Court of Appeals summarized the facts of Petitioner's

11 case as follows:

12          Dan Diorio, a 34-year-old mentally ill man, was last seen alive on Tuesday, September
            14, 1999.  That day, Diorio took six bottles of Heineken beer and went out drinking
13          with James S. Garnett, a man Diorio called his "buddy."  According to Garnett and
            several others, Diorio and Garnett drank beer together at Evelyn's Tavern that day.
14          While there, Diorio flashed a roll of cash.  Diorio regularly carried with him up to
            $10,000 in cash and often counted that money in public.  Garnett said that he left
15          Diorio at Evelyn's.  A bartender at Evelyn's, however, saw Diorio leave the tavern
            with Garnett and a woman.
16
            On October 28, 1999 — six weeks later — Diorio's body was discovered in a shallow
17          grave.  Diorio had been shot twice in the head and had no money on him.  Near
            Diorio's body, there were 18 beer bottles and cans, including one Heineken beer
18          bottle.  A pathologist estimated that he had been dead two to three weeks.

19          Garnett, who regularly paid his rent late, had receipts for several money orders dated
            the day Diorio was last seen alive.  Although Garnett initially cooperated with the
20          police, that cooperation was short-lived.

21          On November 19, 1999, the State charged Garnett with first degree murder.  After
            receiving additional information about the crime from Garnett's wife, the State
22          amended the charge to aggravated first degree murder.[1]

23 (Dkt. No. 12, Ex. 5 at 2-3.)

24

25          ───────────────

            [1]      That same day, the State charged Garnett's wife, Kimberley [sic] Garnett, with
26 aggravated first degree murder.  Skagit Co. Sup. Ct. No. 99-1-00687-8.  Her case was tried
   separately.
27

ORDER — 2

1    Throughout the trial, the trial court required Mr. Garnett to wear a knee brace under his

2   pants, which caused him to walk with a limp as though his knee were stiff.  (Dkt. No. 12, Ex. 28

3   at 106.)  He objected to having to wear the knee brace in front of the jury, contending that it

4   violated his right to a presumption of innocence.  The trial court overruled his objection and

5   stated that there "is a security concern when you have a case of this magnitude . . . ." (Id.)

6    The prosecution introduced into evidence audiotapes that contained recorded statements

7   made by Ms. Garnett, who did not testify at trial, to Kristine Stafford, the State's key witness.

8   Ms. Stafford had helped police in the investigation of the murder of Mr. Diorio by wearing a body

9   wire and prompting Mr. Garnett's wife to talk about the murder.  During cross-examination, the

10   prosecution asked Mr. Garnett's mother if she was aware that Mr. Garnett described in the

11   recorded statements how Mr. Garnett killed the victim:

12    Q:    Are you aware that your daughter-in-law described how your son killed
            Mr. Diorio?
13    A:    No.
      Q:    You weren't aware of that?
14    A:    No.

15   (Id., Ex. 35 at 1402-03.)  Mr. Garnett moved to strike the question and for a mistrial because

16   none of the recorded statements described how he killed the victim.  The trial court granted his

17   motion to strike and denied his motion for a mistrial.  The trial court gave the following

18   instruction to the jury: "Defense counsel's objection is sustained.  And the last question and

19   answer are stricken.  You are instructed to disregard them." (Id. at 1408.)

20    The prosecution submitted into evidence a letter Mr. Garnett wrote to his wife in which he

21   expressed frustration that Ms. Garnett made statements to an informant and expressed confidence

22   in his defense attorney. (Id., Ex. 33 at 1082, 1093-94.)  The prosecution argued that the content

23   of the letter was indicative of guilt.  Mr. Garnett's motion to suppress the letter was denied.

24    One week into Mr. Garnett's trial, Mr. Garnett, through his defense counsel, conducted

25   his first and only interview of Ms. Stafford. (Id., Ex. 13 at Appx. 4.)  During the interview,

26   defense counsel asked Ms. Stafford about any benefits she had received for her assistance. (Id. at

27

ORDER — 3

1   8.)  Before she could answer, the prosecutor interjected and stated that the State had quashed

2   four warrants. (Id.)  Ms. Stafford never answered the question herself.

3          Defense counsel also asked Ms. Stafford if she was using drugs when she wore the wire.

4   Ms. Stafford replied "yes" and stated that she was using at least a "gram a day" of

5   methamphetamine during this time. (Id. at 2.)  Defense counsel asked her where she lived and Ms.

6   Stafford replied that she recently moved back to Sanford, Michigan.

7          Three days after Ms. Stafford's interview, Mr. Garnett's counsel moved for dismissal

8   pursuant to State Court Rule 8.3(b), alleging that the State had withheld information that it was

9   required to disclose from the defense.  (Id., Ex. 33 at 1005-1022.)  Among other things, Mr.

10  Garnett's counsel argued that the State failed to inform defense counsel that Ms. Stafford was

11  using drugs at the time she wore the wire.  Defense counsel also alleged that the State failed to

12  update witness lists with current contact information.  After hearing extensive arguments from the

13  parties, the trial court denied Mr. Garnett's motion to dismiss. (Id. at 1044.)

14         In closing arguments, the prosecution stated that Ms. Stafford "got some warrants

15  quashed" and "got extradited from Montana from the time she wore the wire until the time she

16  testified." (Id., Ex. 36 at 1536.)  The prosecution claimed that Ms. Stafford "didn't get anything

17  from law enforcement" and "she didn't get anything from the prosecution." (Id.)   On November

18  20, 2001, over a year after Mr. Garnett's trial, Ms. Stafford received a $5,000 reward from The

19  Carole Sund/Carrington Memorial Reward Foundation for her assistance in the investigation and

20  her testimony at trial.

21         After testimony concluded, the trial court instructed the jury that they could convict Mr.

22  Garnett on either premeditated first degree murder or felony first degree murder but that all

23  twelve jurors did not have to agree on one alternative in order to return with a guilty verdict.

24  The jury found Petitioner guilty of aggravated first degree murder, and the court sentenced him to

25  life imprisonment without the possibility of parole.

26         Petitioner appealed to the Washington Court of Appeals, which affirmed his conviction.

27

ORDER — 4

1   (Id., Ex. 2.)  His subsequent motion for reconsideration was denied (id., Exs. 6, 7), as was his

2   petition for review in the Washington Supreme Court. (Id., Ex. 10.)  On February 11, 2004,

3   Petitioner filed a Personal Restraint Petition ("PRP") in the Washington Court of Appeals.  (Id.,

4   Ex. 12.)  The court dismissed the PRP. (Id., Ex. 16.)  Petitioner filed a motion for

5   reconsideration, which was forwarded to the Washington Supreme Court and treated as a motion

6   for discretionary review.  (Id., Exs. 17, 18.)   Petitioner filed an actual motion for discretionary

7   review in the Supreme Court together with a motion asking that he be permitted to supplement

8   the existing record.  (Id., Exs. 19, 20.)  Although Petitioner's motion to supplement was granted,

9   his motion for discretionary review was subsequently denied.  (Id., Exs. 21, 23.)  Petitioner's state

10  collateral review by way of the PRP became final June 15, 2005.

11          Petitioner filed the instant petition for writ of habeas corpus pro se on August 26, 2005.

12  (Dkt. No. 4.)  In the petition, he claimed nine grounds for relief: (1) denial of his right to confront

13  witnesses against him by the State's use of his wife's taped-recorded statements; (2) denial of his

14  right to a presumption of innocence and right to a fair trial when he was forced to wear restraints

15  in the presence of the jury; (3) denial of his right to counsel by the State's use of a letter to his

16  wife describing a conversation with his attorney; (4) denial of his right to due process by

17  prosecutorial misconduct; (5) denial of his right to due process by governmental mismanagement

18  and abuse of discretion by the trial court; (6) denial of his right to a fair trial by an impartial jury

19  because the State was relieved of the burden of proving every element of the crime charged; (7)

20  denial of his right to a speedy trial and due process when the State amended the charges eighteen

21  days before trial; (8) denial of his right from unlawful searches and seizures; and (9) denial of his

22  due process rights by the cumulative effect of numerous errors.  (Id.)

23          After Respondent filed an answer and Petitioner filed a reply, Magistrate Judge Benton

24  issued a Report and Recommendation ("R&R") on April 24, 2006. (Dkt. No. 17.)  In the R&R,

25  Magistrate Judge Benton found that Petitioner had not properly exhausted his seventh or ninth

26  grounds for relief. (Id.)  She also found that Petitioner failed to state a cognizable habeas claim

27

1  with respect to his eighth ground for relief.  (Id.)  With respect to the other six grounds,

2  Magistrate Judge Benton denied them on their merits.  Accordingly, Magistrate Judge Benton

3  recommended that the petition be dismissed with prejudice.

4       After the R&R issued, Petitioner filed a motion for appointment of counsel.  On

5  September 29, 2006, this Court granted his motion and counsel was subsequently appointed.

6  (Dkt. Nos. 27, 28.)  Counsel prepared and filed the objections to the R&R.  The matter is now

7  ready for review.

8                              **DISCUSSION**

9  **I.    Standard of Review - Writ of Habeas Corpus**

10      The Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. § 1214 (1996)

11  ("AEDPA"), applies to this petition for habeas corpus because it was filed after April 24, 1996.

12  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under AEDPA, a writ may issue only if the

13  state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable

14  application of, clearly established Federal law, as determined by the Supreme Court of the United

15  States" or was "based on an unreasonable determination of the facts in light of the evidence

16  presented in the State court proceeding." 28 U.S.C. § 2254(d).

17       "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the

18  Supreme Court's decisions.  See Carey v. Musladin, 127 S.Ct. 649, 653 (2006).  A state-court

19  decision is "contrary to" clearly established Supreme Court precedent if the decision "contradicts

20  the governing law set forth in [Supreme Court] cases."  Williams v. Taylor, 529 U.S. 362, 405

21  (2000).  A state-court decision is an "unreasonable application" of federal law " if the state court

22  identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably

23  applies it to the facts of the particular state prisoner's case." Id. at 407.  A federal court reviewing

24  a habeas petition must be convinced that the state court's decision is "more than incorrect or

25  erroneous."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).  The state court's decision must be

26  "objectively unreasonable." Id.  Federal courts must presume the correctness of the state court's

27

ORDER — 6

1   factual findings, but Petitioner may rebut the presumption by clear and convincing evidence. 28

2   U.S.C. § 2254(e)(1).

3        In his objections, Mr. Garnett concedes that Magistrate Judge Benton correctly disposed

4   of grounds seven, eight, and nine.  Mr. Garnett argues that Magistrate Judge Benton erred when

5   she dismissed grounds one through six.

6   **II.    Ground One: Confrontation Clause**

7        Mr. Garnett argues that his wife's tape-recorded statements should not have been

8   admitted under Ohio v. Roberts, 448 U.S. 56 (1980).  In Roberts, the Supreme Court held that

9   hearsay statements of an unavailable witness are admissible if the statements bear an adequate

10  "indicia of reliability."  Roberts, 488 U.S. at 66.  In other words, the statement must fall within a

11  "firmly rooted hearsay exception" or there must be a showing of a "particularized guarantee of

12  trustworthiness." Id.

13       The State contends that the Court should apply Crawford v. Washington, 541 U.S. 36

14  (2004), rather than Roberts despite the Supreme Court's recent ruling in Whorton v. Bockting,

15  127 S.Ct. 1173 (2007), that Crawford does not apply retroactively on collateral review.  The

16  State cites Lockhart v. Fretwell, 506 U.S. 364, 372 (1993), in which the Supreme Court on

17  collateral review applied a new rule that was decided after the defendant's conviction was final.

18  The Court held that the retroactivity rule did not apply to the claims raised by the petitioner. Id.

19       The same proposition advocated by the State in this case was argued and rejected in

20  Whorton.  Indeed, on remand from Whorton, the Ninth Circuit applied Roberts rather than

21  Crawford to the petitioner's habeas claim.  See Bockting v. Bayer, 505 F.3d 973 (9th Cir. 2007).

22  Other district courts within the Ninth Circuit have also applied Roberts when the petitioner's

23  conviction was final before Crawford was decided.  See e.g., Rivas v. Ryan, 2007 WL 1972212,

24  at *8 (S.D. Cal. June 20, 2007) (concluding that because "Petitioner's appeal was decided in

25  1996, and Crawford was decided in 2004, Crawford does not apply to Petitioner's case" and

26  instead "the test in Ohio v. Roberts . . . controls."); Tevaga v. McGrath, 2007 WL 2572245, at

27

ORDER — 7

*12 (N.D. Cal. Sept. 5, 2007).  Nothing in <u>Whorton</u> suggests that <u>Crawford</u> can be applied on collateral review in these circumstances.   The Court concludes that <u>Roberts</u> applies to the facts here.

At issue are two segments of dialogue between Mr. Garnett's wife and the informant, Kristine Stafford, referred to as the "laundromat statement" and the "tazer statement."

<u>Laundromat statement</u>:

| | | |
|---|---|---|
| • | Ms. Garnett: | (inaudible) Well because time wise, technically you know he was only gone 45 minutes to an hour. |
| • | Ms. Stafford: | Oh wow. (inaudible) |
| • | Ms. Garnett: | To do all that.  And he to come home all dirty and sweaty, but he did.  He came home with blood on his jeans. |
| • | Ms. Stafford: | Oh no. |
| • | Ms. Garnett: | (inaudible) |
| • | Ms. Stafford: | Well, yeah. |
| • | Ms. Garnett: | And I remember saying . . . |
| • | Ms. Stafford: | Well that's weird. |
| • | Ms. Garnett: | No it's not nice! And he jumped in the shower and he bagged up his clothes.  And I go in with the pull-up and take them to the laundromat . . . |
| • | Ms. Stafford: | Because, oh . . . |
| • | Ms. Garnett: | Put them in the trash can. |
| • | Ms. Stafford: | Oh, at the laundromat.  Oh, the one down here on Riverside? |
| • | Ms. Garnett: | By Thrifty's |
| • | Ms. Stafford: | Oh, okay, yeah |
| • | Ms. Garnett: | I know you'll never repeat this. |

(Dkt. No. 12, Ex. 2, App. B, Transcript of Tape No. 1.)

<u>Tazer statement</u>:

| | | |
|---|---|---|
| • | Ms. Stafford: | I was just curious 'cause Dan I heard was pretty tough. |
| • | Ms. Garnett: | He's a big boy actually. |
| • | Ms. Stafford: | I mean I heard he was strong too though. |
| • | Ms. Garnett: | Well he is.  He was very strong. |
| • | Ms. Stafford: | That's why I was wondering if James hit him, got him from behind or what? |
| • | Ms. Garnett: | Well he had a zapper. |
| • | Ms. Stafford: | He should have tested it on a dog or . . . |
| • | Ms. Garnett: | Well we were going to test it on somebody.  We just couldn't get anybody. |
| • | Ms. Stafford: | Fuck, Come here! |
| • | Ms. Garnett: | Josh, Josh called over Little Leroy and . . . |
| • | Ms. Stafford: | Uh-huh. |

ORDER — 8

| | • | Ms. Garnett: | We were going to do it on him.  You know surpri [sic], let me fucking try it on you, I'll pay you 200 bucks. |
| 1 | | | |
| 2 | • | Ms. Stafford; | Un-huh. |
| | • | Ms. Garnett: | And he was good . . . |
| 3 | • | Ms. Stafford: | Uh-huh. |
| | • | Ms. Garnett: | And then Josh changed his mind or something. |
| 4 | • | Ms. Stafford: | Fuck. |
| | • | Ms. Garnett; | I know. |
| 5 | • | Ms. Stafford: | I used to carry one of those for protection.  My brother, like I said, turned up the amp though so it fucking didn't just hurt him it'd knock him out. |
| 6 | | | |
| | • | Ms. Garnett: | Yuhhh. |
| 7 | • | Ms. Stafford: | Where did you guys get it at, Northern Sales? |
| | • | Ms. Garnett: | We bought it up in Bellingham. |
| 8 | • | Ms. Stafford: | Really? |
| | • | Ms. Garnett: | At that shop up there. |
| 9 | • | Ms. Stafford: | (inaudible) |
| | • | Ms. Garnett: | A gun shop or whatever it is. |
| 10 | • | Ms. Stafford: | Oh really.  I thought, you used to have to go to like the Army Surplus to get 'em. |
| 11 | • | Ms. Garnett: | Yeah, well the only place we could find them was (inaudiable). |
| 12 | • | Ms. Stafford: | They have them here at the . . . |
| | • | Ms. Garnett: | We ended up stealing it as a matter of fact. |
| 13 | • | Ms. Stafford: | Oh really. |
| | • | Ms. Garnett: | Yeah, out of the store. Yeah. |

14

15    (Id., Transcript of Tape No. 7.)

16          Analyzing her statements under Roberts, the Washington Court of Appeals concluded that

17    Ms. Garnett's statements were admissible because the statements fell within a firmly-rooted

18    hearsay exception — they were statements against penal interest.  See Fed. R. Evid. 804(3)(b).

19    The Supreme Court has not addressed the issue of whether a statement against interest made by

20    an accomplice in a private setting falls within a firmly rooted hearsay exception.  See Padilla v.

21    Terhune, 309 F.3d 614, 618 (9th Cir. 2002).  Magistrate Judge Benton concluded that the

22    statements were reliable, not under a firmly rooted hearsay exception, but under the Roberts'

23    trustworthiness doctrine.  Magistrate Judge Benton concluded that the statements were

24    sufficiently trustworthy because Ms. Garnett made the statements in private to a friend without

25    mitigating her own role in the crime.  (R&R at 14.)

26          Mr. Garnett argues that Magistrate Judge Benton incorrectly applied Padilla in concluding

27

ORDER — 9

1   that the statements met the <u>Roberts</u> reliability requirement.  In <u>Padilla</u>, the Ninth Circuit held that

2   "when an accomplice makes a statement incriminating the defendant in private, to a friend,

3   without mitigating his own role in the crime, the circumstances surrounding the statement provide

4   a particularized guarantee of trustworthiness." <u>Padilla</u>, 309 F.3d at 618-19 (citing <u>United States v.</u>

5   <u>Boone</u>, 229 F.3d 1231, 1234 (9th Cir. 2000)) (internal quotations omitted).  But even if such

6   circumstances exist, <u>Padilla</u> still requires a court to consider the entirety of the circumstances

7   under which a statement was made in order to determine whether it is so reliable that cross-

8   examination is unnecessary.  <u>Padilla</u>, 309 F.3d at 619.  Mr. Garnett asserts that Magistrate Judge

9   Benton failed to do this fact specific analysis and instead concluded that because certain

10  circumstances existed — the statements were made in private, to a friend, without minimizing her

11  own role — Ms. Garnett's statements were *per se* trustworthy.

12          Mr. Garnett argues that the reliability of Ms. Garnett's statements is diminished because

13  Ms. Garnett had a motive to lie to Ms. Stafford and minimized her role in the crime.  He contends

14  that she knew she was being investigated for the murder and suspected the police were listening

15  to her conversations.  He points out that the trial court recognized that Ms. Garnett was

16  "essentially putting all of the blame and most blame on James Garnett and saying [she] had a very

17  peripheral role here." (Dkt. No. 12, Ex. 25 at 17.)  But the trial court was referring to other

18  statements made by Ms. Garnett that it found to be unreliable and inadmissible.[2] (<u>Id.</u> at 19.)

19          In the "tazer" statement, Ms. Garnett does not minimize her role — she admits to crimes

20  of rendering criminal assistance and petty theft. (<u>Id.</u>, Ex. 5 at 7-8.)  In terms of the "laundromat"

21  statement, taken alone, a discussion of washing blood off Mr. Garnett's jeans is not a discussion

22  of criminal activity.  But combined with her request that Ms. Stafford "never repeat this," Ms.

23

24          [2]     Mr. Garnett argues that the Court should consider Ms. Garnett's other statements that
        were not admitted at trial. (Dkt. No. 20 at 10.)  But as Mr. Garnett himself points out, the "court
25      should consider only the inherent trustworthiness of the hearsay statement without reference to other
        evidence." (<u>Id.</u> at  at 8)(citing <u>Idaho v. Wright</u>, 497 U.S. 805 (1990)).  The Court will consider only
26      the statements that are at issue.

27

1  Garnett's statement indicates that she trusted Ms. Stafford and that Ms. Garnett was participating

2  in criminal activity.

3      Mr. Garnett also argues that Ms. Garnett had a motive to lie to Ms. Stafford because Ms.

4  Garnett was addicted to meth and heroine and depended on Ms. Stafford for her drugs.  But Ms.

5  Garnett had limited incentive to please Ms. Stafford because Ms. Garnett could get the drugs for

6  herself.  The evidence showed that she was using drugs before she met Ms. Stafford —  she was

7  suffering withdrawals from her meth and heroine addiction at the time Ms. Stafford met her in jail.

8  (Id., Ex. 13, Appx. 4 at 3.)  Ms. Stafford also testified that she never gave Ms. Garnett money for

9  drugs and that sometimes Ms. Garnett supplied the drugs on which they got high. (Id., Ex. 33 at

10  1210.)  Ms. Stafford also testified that she never said that Ms. Garnett needed her assistance to

11  obtain drugs. (Id. at 1211.)  Ms. Garnett went through Ms. Stafford's "connections" because it

12  was "easier," not impossible, for Ms. Garnett to obtain the drugs. (Id. at 1212.)  Mr. Garnett's

13  argument that Ms. Garnett's statements are unreliable because she had a motive to lie to Ms.

14  Stafford for drugs is not persuasive.

15      Mr. Garnett also contends that her statements are unreliable because Ms. Garnett was high

16  at the time she made the statements.  This allegation, even if true, does not undermine the

17  reliability of her statements.  Her statements are coherent — she follows along in the conversation

18  without issue.  Whether she is a drug addict and was high at the time of her statements are

19  credibility issues for the jury to consider.

20      Because Ms. Garnett (1) made her statements to a friend in private without minimizing her

21  own role, (2) did not have an incentive to lie to Ms. Stafford, (3) implicated herself in a crime, and

22  (4) did not want her statements repeated, Ms. Garnett's statements are sufficiently reliable such

23  that their use at trial did not violate the Confrontation Clause.  Accordingly, Mr. Garnett's request

24  for habeas relief based on his first ground is DENIED.

25  **III.   Ground Two: Physical Restraints**

26      Mr. Garnett challenges the trial court's decision to force him to wear a knee brace under

27

1   his pant leg in front of the jury.  The knee brace altered his gait causing him to walk as though his

2   knee were stiff.  Magistrate Judge Benton concluded that although the trial court did not set forth

3   an adequate factual basis for its decision to restrain Mr. Garnett, the state courts properly rejected

4   his challenge on this ground because: (1) the restraint was not visible to the jury and (2) it was

5   unlikely the jury knew he was restrained.

6          In his objections, Mr. Garnett argues that the trial court abused its discretion when it did

7   not provide an adequate factual basis to conclude that the restraints were necessary and when it

8   allowed the jury to see the "effect of the restraint."  Mr. Garnett argues that the use of the

9   restraints violates <u>Deck v. Missouri</u>, 544 U.S. 622, 629 (2005), in which the Supreme Court held

10  that the use of physical restraints visible to the jury, absent a trial court determination that they are

11  justified by a state interest specific to a particular trial, violates due process.  At a minimum, Mr.

12  Garnett requests an evidentiary hearing to determine whether the jurors knew he was restrained.

13         <u>Deck</u> is not applicable here because Mr. Garnett's knee brace was not visible to the jury.[3]

14  <u>Deck</u> dealt with a situation in which the defendant's shackles were visible to the jury.  Mr. Garnett

15  does not assert that the leg restraint itself was visible to the jury.  Instead, Mr. Garnett argues that

16  a due process violation can occur when a defendant is forced to wear a leg brace under his pants,

17  citing <u>Packer v. Hill</u>, 291 F.3d 569 (9th Cir. 2002).  But the court in <u>Packer</u> actually found that

18  habeas relief was <u>not</u> warranted because "[n]one of the jurors who were interviewed after trial

19  remembered <u>seeing</u> the leg brace on Packer." <u>Id.</u> at 583 (emphasis added).  Mr. Garnett does not

20  cite to any authority suggesting that due process is violated when a jury sees only the "effect of

21  the restraints."  In fact, <u>Deck</u> suggests that concealed shackles are not problematic.  <u>See</u> 544 U.S.

22  at 634-635 (noting that the trial court did not explain "why, if shackles were necessary, [the trial

23  court] chose not to provide for shackles that the jury could not see").

24         Because Mr. Garnett's restraints were not visible to the jury and because Mr. Garnett

25

26         [3] Because the Court concludes that <u>Deck</u> is distinguishable, the Court need not consider
    whether <u>Deck</u> can be applied retroactively.

27

ORDER — 12

1    offers no support for his argument that the visibility of the effect of the restraint violates due

2    process, the Court concludes that Mr. Garnett was not denied a fair trial when he was forced to

3    wear a knee brace under his pant leg.  His request for habeas relief based on this second ground is

4    DENIED.

5    **IV.   Ground Three: Right to Counsel**

6          Mr. Garnett challenges the trial court's decision to admit a letter that he wrote to his wife

7    in which he makes reference to his attorney.  The prosecutor argued that the letter was indicative

8    of guilt, which Mr. Garnett claims violated his right to counsel.  Mr. Garnett argues that the

9    prosecutor insinuated that his hiring of an attorney was probative of guilt.  See Bruno v. Rushen,

10   721 F.2d 1193, 1194 (9th Cir. 1983) (holding that defendant's right to counsel was violated when

11   prosecutor directly attacked the accused's claim of innocence by openly hinting to the jury that

12   the accused's hiring of counsel was in some way probative of his guilt).

13         Magistrate Judge Benton correctly concluded that the state courts reasonably rejected Mr.

14   Garnett's claim.  As the State points out, the prosecutor's comment regarding the letter was not

15   focused on Mr. Garnett's hiring of counsel.  Rather, the letter was reflective of Mr. Garnett's

16   state of mind – he was bullying and pressuring his wife, and he suggested that his attorney would

17   help him get away with something.  Accordingly, the admission of Mr. Garnett's letter did not

18   violate his right to counsel.  Mr. Garnett's request for habeas relief based on this third ground is

19   DENIED.

20   **V.   Ground Four: Prosecutorial Misconduct**

21         Mr. Garnett asserts that prosecutorial misconduct prohibited him from obtaining a fair

22   trial.  He argues that one of the prosecutor's questions was so egregious that it cannot be

23   presumed that the jury followed the trial court's instruction to disregard it.  The prosecutor asked

24   Mr. Garnett's mother the following series of questions regarding the tape-recorded statements

25   made by Ms. Garnett:

26         Q:    Are you aware that your daughter-in-law described how your son killed
               Mr. Diorio?

27

ORDER — 13

1    A:     No.
        Q:     You weren't aware of that?
2    A:     No.

3       The trial court agreed with Mr. Garnett that there were no such statements on the tapes

4 and the prosecutor's question amounted to misconduct. The trial court instructed the jury to

5 disregard the "last question." The court of appeals concluded, and Magistrate Judge Benton

6 agreed, that Mr. Garnett offered no evidence or arguments to support his assertion that the

7 instruction was inadequate to cure the prosecutor's conduct.

8       In his objections, Mr. Garnett essentially repeats his argument that the instruction could

9 not cure the misconduct. The general rule is that juries are presumed to follow court instructions.

10 Weeks v. Angelone, 528 U.S. 225, 234 (2000). But in Bruton v. United States, 391 U.S. 123,

11 137 (1968), the Supreme Court held that curative instructions are insufficient to overcome

12 prejudicial statements in certain circumstances.

13       Given the nature of the evidence presented and the gravity of the prosecutor's comment, it

14 is unlikely that the jury followed an instruction to disregard a statement suggesting that Mr.

15 Garnett confessed to the murder. See Bruton v. United States, 391 U.S. at 137 (concluding that

16 "[d]espite the concededly clear instructions to the jury to disregard . . . inadmissible hearsay

17 evidence inculpating petitioner . . . [t]he effect is the same as if there had been no instruction at

18 all."); see also Jackson v. Denno, 378 U.S. 368, 385 n. 12 (1964) (concluding that "[r]egardless

19 of explicit instructions . . . we think the likelihood that these forbidden considerations enter the

20 jury's deliberations too great for us to ignore."). As the trial court noted, the jury was left with

21 the impression that somewhere in the tapes Ms. Garnett described how Mr. Garnett killed the

22 victim, even though no such description existed. (Dkt. No. 12, Ex. 35 at 1405.) The jury was left

23 to speculate about whether there were other recorded statements that, for reasons unknown to the

24 jury, were not provided to them. Moreover, the fact that this case was tried entirely on indirect

25 evidence makes the prosecutor's statement all the more prejudicial and difficult to cure. No

26 physical forensic evidence or live witnesses directly indicated that Mr. Garnett killed the victim.

27

ORDER — 14

1    Further, the trial court's instruction to the jury was not adequate to cure the misconduct.

2    The instruction was inadequate because it was directed at the wrong question – "You weren't

3    aware of that?" — rather than the actually prejudicial question — "Are you aware that your

4    daughter-in-law described how your son killed Mr. Diorio?" — that preceded the last question.

5    Thus, even if the court correctly presumed that the jury followed the trial court's instruction, that

6    instruction did not actually address the prejudicial question.  The prosecutor's misconduct made it

7    imperative that the trial court adequately instruct the jury regarding what they specifically needed

8    to disregard.  The Court will not assume that the jury understood that they were meant to

9    disregard the prejudicial question.  The court of appeals' presumption that the jury disregarded

10   the prosecutor's statement is an unreasonable determination of the facts in light of the evidence

11   presented.  Habeas relief is warranted under 28 U.S.C. § 2254(d)(2).

12   **VI.   Ground Five: Government Misconduct**

13       Mr. Garnett asserts a <u>Brady</u> violation,[4] arguing that he was deprived due process as a

14   result of prosecutorial misconduct and mismanagement of the case.  At trial, he filed a motion to

15   dismiss under Criminal Rule (CrR) 8.3(b), which provides in part:

16       The Court . . . may dismiss any criminal prosecution due to arbitrary action or
         governmental misconduct where there has been prejudice to the rights of the accused
17       which materially affect the accused's rights to a fair trial . . . .

18       Magistrate Judge Benton concluded that Mr. Garnett failed to state a cognizable claim for

19   federal habeas relief on this ground because he contested a decision made under a state procedural

20   rule rather than a constitutional rule.  Mr. Garnett disputes this conclusion and he points to

21   sections of the record where he asserted that the State's conduct amounted to a <u>Brady</u> violation.

22       In his motion to dismiss at trial, Mr. Garnett requested relief under the Fourth Amendment

23   of the U.S. Constitution and Article I, Section 7 of the Washington Constitution in addition to

24   _____

25       [4]    In <u>Brady v. Maryland</u>, the Supreme Court held "that the suppression by the
     prosecution of evidence favorable to an accused upon request violates due process where the
26   evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the
     prosecution." 373 U.S. 83, 87 (1963).
27

ORDER — 15

1    CrR 8.3. (Dkt. No. 12, Ex. 13 at Appx. 3a.)  In his brief to the court of appeals, he argued that

2    the trial court's denial of his motion to dismiss was an abuse of discretion because his "right to

3    due process of law and fair trial, secured by both state and federal constitutions," was violated.

4    (Id., Ex. 13 at 5.)  The record shows that Mr. Garnett adequately preserved his fifth ground for

5    relief by raising the constitutional issue regarding prosecutorial misconduct.

6        Mr. Garnett asserts that the State withheld information about the benefits Ms. Stafford

7    received in exchange for her assistance and testimony.  He claims that when his defense attorney

8    specifically asked about these issues, the State indicated that it had only quashed four warrants for

9    Ms. Stafford.  But he contends that Ms. Stafford actually received more benefits than the State

10   disclosed.  He claims that in addition to quashing the warrants, she was given the following

11   benefits:

12        1)    She received a $5,000 reward for her assistance related to the victim's
                disappearance;
13        2)    She avoided being extradited to Montana for a period of time;
          3)    She was allowed to participate in drug court despite criminal history and dirty
14              urinalysis results; and
          4)    She received concessions for additional felony offenses.
15

16        Mr. Garnett alleges that the State's investigator was facilitating the $5,000 payment to

17   Ms. Stafford at the time of trial.  Mr. Garnett contends that because the prosecutor failed to

18   disclose this information, his defense counsel was unable to attack Ms. Stafford's credibility and

19   the reliability of her statements and the State was able to defend her credibility in closing

20   argument.  The parties dispute whether at the time of trial the State knew of additional benefits to

21   be provided to Ms. Stafford with the State's assistance.  At a minimum, Mr. Garnett requests an

22   evidentiary hearing to inquire as to the full extent and timing of benefits Ms. Stafford received

23   from the State.

24        It is not clear from the record or from the parties' briefs whether the State investigator

25

26

27

ORDER — 16

1   knew prior to, or during, trial that Ms. Stafford would receive the $5,000 reward.[5]  It is also

2   unclear from the record whether the State failed to disclose to defense counsel the additional

3   information received by Ms. Stafford.

4          "In deciding whether to grant an evidentiary hearing, a federal court must consider

5   whether such a hearing could enable an applicant to prove the petition's factual allegations,

6   which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 127 S.

7   Ct. 1933, 1940 (2007).  As a general rule, an evidentiary hearing is not warranted if the petitioner

8   failed to develop the factual basis of the claim in the State court proceedings. 28 U.S.C. §

9   2254(e)(2).  But even if a petitioner has failed to develop a factual basis, the Court may grant an

10  evidentiary hearing if the claim relies on "a factual predicate that could not have been previously

11  discovered through the exercise of due diligence" and "the facts underlying the claim would be

12  sufficient to establish by clear and convincing evidence that but for constitutional error, no

13  reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C.

14  § 2254(e)(2)(A) & (B).

15         The Court finds that these exceptions to the general rule are met in this case.  Whether the

16  State knew about additional benefits received by Ms. Stafford are factual predicates that could not

17  have been discovered earlier.  Further, because Ms. Stafford was the State's key witness and the

18  conviction was based on entirely circumstantial evidence, it is reasonable to conclude that the

19  State's withholding of this information would be prejudicial.  The Court concludes that an

20  evidentiary hearing is warranted on the issue of whether the State knew Ms. Stafford received

21  additional benefits and whether this information was withheld from the defense.

22         Mr. Garnett also contends that the State failed to make Ms. Stafford available to interview

23

24          [5]      Mr. Garnett cites to evidence in the record that he believes shows that the State knew
25  Ms. Stafford was going to get paid the reward.  But he cites to exhibits more than 100 pages long
    without pointing to a specific location in the record.  As far as the Court can ascertain from the
26  voluminous documents cited by Mr. Garnett, nothing proves his assertion that the State's private
    investigator was facilitating a payment to Ms. Stafford at the time of trial.
27

ORDER — 17

1    and did not provide her correct address until after trial began. (Dkt. No. 12, Ex. 13 at 9.)  The last

2    witness list filed on July 20, 2000, stated that Ms. Stafford lived in Sedro Woolley, Washington,

3    when in fact she was in Michigan at the time.  But as the trial court found, the State made every

4    effort to keep the defense apprised of where she was residing.  It is not disputed that Ms. Stafford

5    moved several times in the course of these proceedings, whether she was going home to Michigan

6    or traveling in Montana.  The record shows that the prosecution attempted to set up a phone

7    interview with defense counsel while Ms. Stafford was in Michigan. (Id., Ex. 33 at 1025.)  When

8    the State learned Ms. Stafford was arrested in Montana, the State provided a copy of the warrant

9    to defense counsel in discovery. (Id. at 1024.)  When Ms. Stafford was about to get out of jail,

10   the State provided the defense a copy of the plane tickets and itinerary so defense counsel would

11   know when Ms. Stafford would arrive in Washington. (Id.) When Ms. Stafford went on vacation,

12   the State e-mailed the information to defense counsel. (Id., at 1025.)  The record also suggests

13   that the defense counsel had several opportunities to interview Ms. Stafford prior to trial. (Id. at

14   1013-14.)

15       Mr. Garnett's contention that the State withheld Ms. Stafford's drug use at the time she

16   wore the wire is also without merit.  As the trial court found, the recorded conversations between

17   Ms. Stafford and Ms. Garnett referred to items that would lead a reasonable person to conclude

18   that they were using drugs during the time in question.  (Id. at 1046.)  Detectives were concerned

19   that Ms. Stafford was using drugs and asked her 15 to 20 times whether she was using drugs.

20   (Id.).  Ms. Stafford admits that she hid her drug use from detectives and wore long-sleeved shirts

21   so they would not see the evidence of her drug use. (Id.)

22       When detectives found out Ms. Stafford was using drugs, a lengthy detailed report was

23   prepared regarding the encounter.  The trial court found that this report had been available to

24   defense counsel for many months prior to trial. (Id.)  Even Mr. Garnett's defense counsel

25   conceded to the trial court that Ms. Stafford's use of drugs was suspected by all parties:

26       It is not the fact that she was using drugs or that Ms. Stafford, they were using
         drugs. We all suspected that.  The police officer suspected that.  They suspected

27

ORDER — 18

1    there was rampant drug use. . . .

2    (Id., Ex. 33 at 1037.)  The Court concludes that the trial court's decision was reasonable that the

3    State did not withhold Ms. Stafford's drug use information.

4         Because it appears that Ms. Stafford was made available to the defense prior to trial, the

5    State made reasonable efforts to keep defense counsel appraised of her whereabouts, and the

6    State did not withhold information about Ms. Stafford's drug use, the trial court's conclusion

7    regarding these issues is reasonable.  But because it is not clear whether the State withheld

8    information regarding benefits Ms. Stafford received, the Court concludes that an evidentiary

9    hearing is necessary to further develop the record.

10        Nevertheless, the Court will not schedule an evidentiary hearing at this time. Two other

11   grounds warrant habeas relief.  The Court need not expend valuable time and scarce judicial

12   resources conducting an evidentiary hearing on one ground where other grounds provide for the

13   same relief. Robbins v. Smith, 152 F.3d 1062, 1068-69 (9th Cir. 1997), rev'd on other grounds,

14   528 U.S. 259 (2000); Rice v. Wood, 44 F.3d 1396, 1402 n.10 (9th Cir. 1995), vacated in part on

15   other grounds, 77 F.3d 1138 (9th Cir. 1996); Blazak v. Ricketts, 971 F.2d 1408, 1413-14 (9th

16   Cir. 1992).

17   **VII.   Ground Six: Erroneous Jury Instruction**

18        Mr. Garnett asserts that the trial court, in instructing the jury, violated his due process

19   rights because the State was relieved of its burden of proving every element of the crime beyond a

20   reasonable doubt.  Mr. Garnett was charged with aggravated first degree murder and first degree

21   felony murder.  He takes issue with the instruction's description of the alternative offenses that

22   the jury could consider in order to find him guilty.  The challenged instruction stated as follows:

23        If you find from the evidence that each and every element of "A" [premeditated
          murder in the first degree] or "B"[felony murder in the first degree], or "A" and
24        "B", has been proved beyond a reasonable doubt, then it will be your duty to
          return a verdict of guilty to the charge of murder in the first degree. The elements
25        in "A" and "B" are alternatives.  To return a verdict of guilty, all twelve jurors
          need not agree as to which alternative, "A" or "B" has been proved beyond a
26        reasonable doubt.  However, each juror must find that all the elements in either
          "A" or "B" exist beyond a reasonable doubt.
27

ORDER — 19

On the other hand, if after weighing the evidence, you have a reasonable doubt as to any element in "A" and a reasonable doubt as to any element in "B" then it will be your duty to return a verdict of not guilty to the charge of murder in the first degree.

(Dkt. No. 12, Ex. 15, Appx. C, Instruction No. 8 (emphasis added)).  The jury returned a special verdict finding Mr. Garnett guilty of premeditated murder and not felony murder.

The court of appeals concluded that although it was "inartfully worded," the challenged instruction was not an erroneous statement of law. The Supreme Court Commissioner agreed and further noted that if the statement was erroneous, Mr. Garnett invited the error.  Magistrate Judge Benton concluded that the state appellate courts properly rejected this claim, reasoning that the challenged instruction, when read in conjunction with the special verdict forms, comports with due process.  Special Verdict Form A provided:

1.    Were you able to unanimously agree beyond a reasonable doubt that the defendant, James Garnett, committed premeditated murder in the first degree? (Alternative A in INSTRUCTION NO.  8  ) [ ] Yes          [ ] No

**If you answered "yes" to Special Verdict Question 1, please complete "Special Verdict Form B."  If you answered "no," you do not need to complete "Special Verdict Form B."**

(Dkt. No. 12, Ex. 15, Appx. E.)  The jury answered "Yes" to the question presented in Special Verdict Form A and proceeded to Special Verdict Form B.  Special Verdict Form B asked the jury to make findings regarding aggravating circumstances and began with the following language:

We, the jury, having found the defendant guilty of premeditated murder in the first degree (Alternative A) as charged in the information, make the following answers to the questions submitted by the court.

(Id., Appx. F.)  The jury answered "Yes" to the questions presented in Special Verdict Form B finding that the State had proved the existence of aggravating circumstances beyond a reasonable doubt.  (Id.)

Before a state court conviction can be overturned based on an erroneous jury instruction, a petitioner must establish "not merely that the instruction is undesirable, erroneous, or even

ORDER — 20

1    'universally condemned,' but that it violated some right which was guaranteed to the defendant by

2    the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973).  The Supreme Court

3    has held that a single instruction to a jury may not be judged in artificial isolation, but must be

4    viewed in the context of the overall charge. Id. at 146-47.  Federal habeas courts are not to

5    reexamine state court conclusions regarding matters of state law.  Estelle v. McGuire, 502 U.S.

6    62, 67-68 (1991).  A jury instruction violates the due process guarantees of the Fourteenth

7    Amendment if it relieves the state of its burden to prove every element of the charged offense

8    beyond a reasonable doubt. Carella v. California, 491 U.S. 263, 265 (1989).

9           **A.     Challenged Jury Instruction**

10          Mr. Garnett argues that the challenged instruction is a misstatement of the law because it

11   does not require the jury to unanimously agree on which of the alternative offenses (premeditated

12   or felony murder) was proved beyond a reasonable doubt, essentially allowing the jury to mix and

13   match the elements of each charge.  He points out that the jury instruction was derived from

14   instructions in which there were alternative means of committing the charged offense, rather than

15   alternative offenses, as in this case.

16          Despite the findings of the state appellate courts and deference given to such courts

17   regarding matters of state law, the challenged instruction is unequivocally wrong.  Aggravated

18   first degree murder and felony murder are two different offenses, with different statutory

19   elements.  See RCW 10.95.020 (aggravated first degree murder is based only on premeditated

20   intentional murder).  They are not different means of committing the same offense.  See State v.

21   Meas, 118 Wn. App. 297, 302-03 (2003).  The jury was therefore required to unanimously agree

22   that the State proved all the elements of at least one of the alternative offenses (aggravated or

23   felony) beyond a reasonable doubt.

24          The challenged instruction relieves the State of its burden. The state appellate courts

25   incorrectly concluded that the "jury could not have reasonably misread the instruction allowing it

26   to 'mix and match' elements of the two alternatives to reach a hybrid verdict."  That outcome is

27

1   exactly what the instruction invites the jury to do: "To return a verdict of guilty, all twelve jurors

2   <u>need</u> <u>not</u> agree as to which alternative, "A" or "B" has been proved beyond a reasonable doubt."

3   (Dkt. No. 12, Ex. 15, Appx. C, Instruction No. 8 (emphasis added)).

4           **B.      Jury Instructions as a Whole**

5           The Court must still consider the challenged instruction within the context of the

6   instructions and the trial record as a whole. <u>See</u> <u>Estelle</u>, 502 U.S. at 72 (citing <u>Cupp</u>, 414 U.S. at

7   147).  Mr. Garnett insists the special verdict forms do not cure the incorrect instruction.

8           The jury returned a <u>general verdict</u> of guilty to the charge of murder in the first degree.

9   Special Verdict Form A asks the jury if they were unanimous as to <u>premeditated murder</u>.  Mr.

10   Garnett points out that unlike Washington Pattern Instructions – Criminal ("WPIC") 4.25 and

11   190.9, Special Verdict Form A does not instruct the jury that two alternative offenses are actually

12   separate crimes and that the jury must decide them separately.  Nor does the verdict form inform

13   the jury that to convict Mr. Garnett of either offense, the state must prove each and every element

14   of the offense and that the jury must unanimously agree that all the elements of the offense were

15   proved.  Mr. Garnett also points out that the jury was not instructed that in order to answer the

16   special verdict form "yes," that the jury must unanimously be satisfied beyond a reasonable doubt

17   that "yes" is the correct question, even though that language is standard in WPIC 160.00. Mr.

18   Garnett claims that the record does not show whether the jury based its general verdict of guilt for

19   first degree murder on a unanimous decision regarding aggravated premeditated murder.

20           The Court agrees with Mr. Garnett and concludes that even when read as a whole, the

21   jury instruction relieved the State of its burden to prove every element of the charged offense

22   beyond a reasonable doubt.  Although Special Verdict Form A requires that the jury answer

23   whether or not they "unanimously" agreed beyond a reasonable doubt that Mr. Garnett committed

24   "premeditated murder in the first degree," the challenged instruction instructs the jury that they

25   can disagree on <u>which</u> alternative offense has been proved beyond a reasonable doubt.  The jury

26   could then assume that they could answer "yes" on Special Verdict Form A even though all

27

ORDER — 22

1   twelve jurors did not agree that Mr. Garnett committed premeditated murder.

2       The Court further concludes that the Washington Supreme Court erred when it

3   determined that Mr. Garnett invited the instructional error by presenting a "to convict" instruction

4   statement that the elements in 'A' and 'B' are alternatives.  It was the State, not Mr. Garnett, who

5   proposed the erroneous language.  (See Dkt. No. 12, Ex. 15, Appx. H.)  Mr. Garnett actually

6   proposed a correct instruction that instructed the jury that they "must be unanimous as to whether

7   that alterative is proved by evidence beyond a reasonable doubt." (Id. Appx. I.)  Mr. Garnett did

8   not invite the error.

9       Accordingly, the erroneous jury instructions relieved the State of its burden to prove every

10  element of the offense beyond a reasonable doubt in violation of the Fourteenth Amendment.

11  Habeas relief on this ground is warranted under 28 U.S.C. § 2254(d).

12                              **CONCLUSION**

13      Petitioner James Garnett raised six grounds for relief in his habeas petition.  Although

14  grounds one through three do not have merit, the Court concludes that grounds four and six

15  warrant habeas relief.  With respect to Mr. Garnett's fifth ground for relief, the Court finds that

16  there are gaps in the record necessitating an evidentiary hearing, but concludes that it need not

17  hold an evidentiary hearing at this time.  The Court therefore ADOPTS IN PART and

18  DECLINES TO ADOPT IN PART Magistrate Judge Benton's Report & Recommendation.  The

19  Court GRANTS James Garnett's habeas petition.  Mr. Garnett's conviction in Skagit County

20  Superior Court Case No. 99-1-00636-3 is VACATED.

21      The Court further orders that the execution of this order shall be STAYED for thirty (30)

22  days.  The STAY shall remain in effect until **February 25, 2008**.  The clerk is directed to send a

23  copy of this order to all counsel of record and to Magistrate Judge Benton.

24      DATED: January 24th, 2008.

25                                  Marsha J. Pechman

26                                  United States District Judge

27

ORDER — 23